## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |
|---|---|
| TUSIMPLE, INC.,<br><br>　　　　　Plaintiff,<br><br>　vs.<br><br>BOT AUTO, INC., BOT AUTO TX, INC., and<br>BOT AUTO CA, INC.,<br><br>　　　　　Defendants. | **Civil Action No. _____**<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT FOR PATENT INFRINGEMENT

1.　　Plaintiff TuSimple, Inc. ("TuSimple" or "Plaintiff") files this Complaint against defendants Bot Auto Inc., Bot Auto TX Inc., and Bot Auto CA Inc. (collectively, "Bot Auto" or "Defendants") for infringement of U.S. Patent No. 11,577,776 (the "'776 Patent"); U.S. Patent No. 12,049,270 (the "'270 Patent"); U.S. Patent No. 11,884,284 (the "'284 Patent"); U.S. Patent No. 11,076,109 (the "'109 Patent"); U.S. Patent No. 12,231,783 (the "'783 Patent"); and U.S. Patent No. 12,190,609 (the "'609 Patent") (collectively, the "Asserted Patents").

## THE PARTIES

2.　　Plaintiff TuSimple, Inc. is a Delaware corporation having its principal place of business at 9191 Towne Centre Dr., Suite 295, San Diego, California 92122.

3.　　On information and belief, Defendant Bot Auto, Inc. is a Delaware corporation with its principal place of business at 15310 Park Row, Houston, Texas 77084.

4.　　On information and belief, Defendant Bot Auto TX, Inc. is a Texas corporation with its principal place of business at 15310 Park Row, Houston, Texas 77084.

5.      On information and belief, Defendant Bot Auto CA, Inc. is a California corporation with its principal place of business at 1401 12th Street, Suite R, Sacramento, California 95811.

6.      On information and belief, each of Bot Auto, Inc., Bot Auto TX, Inc., and Bot Auto CA, Inc. is an affiliate of the others, and all are under common control and management and are controlled by Xiaodi Hou, an individual described below.

## JURISDICTION AND VENUE

7.      This action arises under the patent laws of the United States, 35 U.S.C. § 1 *et seq.* This Court has subject matter jurisdiction over this patent infringement action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

8.      This Court has personal jurisdiction over Defendants.  Defendants have regularly conducted and continue to conduct business in the State of Texas and in the Southern District of Texas.  On information and belief, Defendants have committed direct and indirect acts of infringement in the United States, in Texas, and in this federal judicial district by making, using, offering for sale, selling or importing products or services that infringe the Asserted Patents described herein.

9.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1391 and 1400(b) because, upon information and belief, Defendants have a regular and established place of business in the Southern District of Texas at 15310 Park Row, Houston, Texas 77084, and an additional operating facility at 2800 Twinwood Parkway, Building 22, Brookshire, Texas 77423, and have committed acts of infringement within the Southern District of Texas.

## **FACTUAL ALLEGATIONS**

10.    This action arises out of Defendants' knowing infringement of Plaintiff's patented autonomous trucking technology, which Plaintiff developed at significant effort and expense.

11.    Defendants' infringement of Plaintiff's patents follows from a remarkable scheme by Defendants to misappropriate and infringe upon a broad range of business-critical technologies, in the formation of a directly-competing new business.

11.    Defendants' misappropriation and infringement was led in significant part by Xiaodi Hou, the former co-founder, CEO and Chairman of the board of Plaintiff.  Hou is now the founder and CEO of the Defendants, which do business together as Bot Auto.  The wrongdoing perpetrated by Hou and his co-conspirators was motivated by the desire to re-create the business to which Hou had contributed while in the employ of Plaintiff—and to inflict harm upon Plaintiff.  During his tenure with Plaintiff, Hou improperly shared proprietary information of Plaintiff with a company in China, in outright disregard of critical information security measures and a pre-existing National Security Agreement with the United States Departments of Defense and the Treasury.  Hou's conduct ultimately led to a national security investigation causing serious damage to Plaintiff's business, and to his firing by the Plaintiff's Board of Directors from his post as Plaintiff's CEO, and his final resignation from the Board, under further investigation for yet further misconduct and in public disgrace.

12.    In anticipation of and in reaction to these consequences, Hou and Lei Wang, Plaintiff's former Executive Vice President for Technology, and other co-conspirators and concerted actors, implemented a deliberate, surreptitious plan to solicit key employees to a competing enterprise that Hou had begun to establish even while still in Plaintiff's employ, and to sabotage the Plaintiff's continuing business.  Hou, Lei Wang, and their co-conspirators formed

and built the Defendant companies as a vehicle to misappropriate and infringe upon key technologies of Plaintiff, including the innovations in the patents at issue in this action.

13.     These efforts were partially successful, in that Defendants did succeed in wrongfully soliciting dozens of key employees to the competing enterprise, misappropriating key confidential and proprietary information and intellectual property, raising investment capital upon visibly false premises, and infringing upon the patents at issue in this action.  The actionable misconduct at bar thus has substantially damaged Plaintiff, in amounts to be determined, and this action is brought to secure relief for that infringement.

### TuSimple's Development of its Patented Autonomous Trucking Technologies

14.     TuSimple is the United States subsidiary of CreateAI Holdings, Inc., a global artificial intelligence company with offices in the US, China, and Japan (together with TuSimple, the "Company") that develops and markets both autonomous trucking technology and entertainment and gaming products, in each instance developed by application of advanced artificial intelligence technologies, in the United States and internationally.

15.     The Company has been a market leader in autonomous trucking—that is, the development and operation of self-driving freight trucks.  The Company markets its autonomous trucking technologies in the United States and internationally.

16.     The development and marketing of autonomous driving technology is highly competitive and utilizes cutting-edge technology.  In the fast-developing autonomous driving market, unlike in more mature industries, technological advancement and advantage are indispensable for business survival and success.  To succeed in the industry, and over the course of years and upon the investment of hundreds of millions of dollars, the Company developed numerous patented technologies relating to autonomous driving technology.

4

17.     By its efforts, TuSimple became a leader in the sector.  The Company previously partnered with UPS, Navistar, Penske Truck Leasing, and McLane (the grocery and food service supply chain holding company of Berkshire Hathaway), and has worked with overseas customers and co-developers in Sweden, Japan and China.

18.     The Company was the first developer of autonomous trucking technology to achieve "driver-out" operations, meaning the fully autonomous operation of a semi-truck on open public roads without a human in the vehicle or remote human intervention.  This degree of autonomous driving is also commonly referred to in the industry as "Level 4" or "L4" autonomous driving.

19.     Driver-out operations are a necessary step on the path to full deployment of self-driving trucks.  Driver-out operations include the ability for the truck to drive from a terminal (for instance, a warehouse or a parking lot) to another terminal without any direction by a human driver or safety operator.  This level of operation requires the vehicle itself to deal with all of the driving challenges associated with driving at full speed on a highway.

20.     To achieve safe "driver-out" road operations, the Company developed a market-leading autonomous driving system, which includes, *inter alia*, the patented technologies at issue in this action.

21.     This achievement by TuSimple was the result of over seven years of work and the investment of hundreds of millions of dollars in research, development, and innovation in autonomous trucking technology.  These innovations allowed TuSimple to compete with, and succeed over, many better-funded competitors in the autonomous trucking industry.  By way of example, TuSimple's closest competitors, despite having access to significantly greater funding

and resources, have only this year stated that they intend to announce driver out operations. As of this filing, these competitors still have not been able to achieve driver-out operations.

22.    Over a course of seven years, the Company operated a fleet of over 70 Class 8 trucks (*i.e.*, freight trucks) in the United States, and approximately 30 such trucks in Japan and China, to collect road trip data and test its systems. Collectively, these vehicles travelled over 10 million miles—the equivalent of over 100 years of human professional freight driving experience—collecting data all along the way. That data was analyzed and utilized to help develop TuSimple's patented autonomous driving technologies.

23.    Among its autonomous driving technologies, TuSimple developed proprietary automatic safety technologies to ensure that the self-driving trucks equipped with its systems are "fail-safe" (*i.e.*, capable of responding to malfunctions in ways that prevent harm to the system and to persons) and "fail-operational" (*i.e.*, capable of continuing to operate sufficiently to bring the vehicle to a safe stop and to call for attention and repair). A normal freight truck does not include or require such extensive automatic safety systems, because the driver herself constitutes the "backup system"—when the truck encounters a malfunction or loss of power, the driver may react and bring the truck off the road or at minimum to a stop. For an autonomous vehicle to achieve safe and responsible driver-out operations, however, certain backup systems and redundancies are indispensable.

24.    TuSimple has invested years, and many millions of dollars, in the development of these automatic safety technologies. TuSimple has employed a systems and safety team of over 25 employees to develop and deploy the systems that make up those technologies, and over a course of years has developed and deployed its own testing and validation protocols in support of

its successful efforts to achieve high safety standards.  Those technologies incorporate numerous instances of TuSimple proprietary technology, including the patented technologies at issue here.

**Defendants' Scheme to Misappropriate and Copy TuSimple's Patented Technologies**

25.    In 2015, Hou founded TuSimple.  From the beginning, Hou was intimately involved in the overall development of TuSimple's ADS technologies and know-how.  Lei Wang was TuSimple's head of planning—that is, the head of the development of technologies by which autonomous trucks "plan" their driving activities on the road, in real time—and worked with Hou on the development of those systems, as well as redundant safety systems.

26.    In March 2022, Hou was named CEO of TuSimple Holdings, Inc. (that is, TuSimple's parent company, now known as CreateAI Holdings, Inc.).  In the second calendar quarter of 2022, Hou promoted his close confidant Lei Wang to Executive Vice President, Technology, making him the most senior technical employee of the Company and giving him direct working access, along with Hou, to most if not all of Plaintiff's proprietary technologies, including the patented technologies at issue here.

27.    In October 2022, Hou was fired from his post as CEO of the Company by the Plaintiff's Board of Directors and removed from his post as Chairman of the Board.  In its public Form 8-K filed with the Securities and Exchange Commission on October 31, 2022, the Company disclosed that an audit committee investigation had found that Hou had improperly diverted confidential data, design information, and key employee information to a Chinese company that had then been established by Hou's former co-founder of TuSimple, in disregard for critical information security protocols.  In a subsequent Form 8-K filing, on November 7, 2022, the Company disclosed that the Board of Directors had based its decision upon its "loss of trust and confidence" in Hou's judgment and leadership, his lack of candor, and his conduct in connection with the matter.

7

28.     Shortly after being fired, Hou relocated to Harris County, Texas, incorporated Defendants and commenced operations from offices in Harris County.

29.     Although Hou was removed from his position as CEO, as a substantial shareholder of the Company, Hou remained on the Company's Board of Directors for a brief period of time after his firing, until March 2023.

30.     On information and belief, during the interim period after Hou had been fired as CEO and placed under investigation but before his departure from the Company's Board, he both understood and intended that he would soon separate entirely from the Company.  During this period, Hou indicated to others that he intended to start a new enterprise to continue to use the technologies that had already been developed, upon great investments of funds and effort, by TuSimple.

31.     Defendants' website domain name was established by Hou, on or about December 5, 2022—while he was still a member of the Board of Directors of the Company.

32.     On information and belief, Hou and others, acting on behalf of Defendants, solicited and hired key Company personnel who had intimate, personal knowledge of TuSimple's proprietary and patented technologies, so that Defendants could copy and implement such technologies.

33.     On or about December 12, 2022, the Company learned that several key employees, including Lei Wang, had been conducting Company work, using the Company's proprietary information, on their personal computers.  Lei Wang informed the Company that he had already removed such information from his personal computer, but did not advise as to what else he had done with that information.  Other employees, acting in apparent concert with Lei Wang, did the same.  An investigation—which was conducted without the knowledge of Hou's

December 5 establishment of the Bot Auto domain and his and Lei Wang's then-present plans to establish Defendant Bot Auto, or of the employee solicitation issues discussed below—indicated that Company proprietary information, including data, source code, and design information, had indeed resided on the personal computers of Lei Wang and the other employees in question.

34.    In late January and February 2023, two employees communicated to the Company that they had heard rumors that Hou was establishing a new company, and that he was soliciting key employees of TuSimple to join his new venture.  In early March 2023, the Company interviewed several such employees, and they all denied having received any such solicitation from Hou.

35.    One employee then asked to be interviewed again. In that latter interview, that employee advised that he had answered the questions in the previous interview as he had been instructed—by Hou.  The employee revealed that Hou had solicited his employment at a new venture, and was soliciting multiple key employees of TuSimple.  That employee advised that Hou's first such efforts took place in November 2022, shortly after Hou's ouster as CEO; that Hou still had collaborators in TuSimple's employ, working to effect a transition; that Hou had been alerted to the upcoming interviews regarding his solicitation of key TuSimple employees and had contacted those employees prior to their interviews; and that the key employees' cooperation in the investigation of their use of personal computers had been a tactic, intended to cover their tracks in connection with their departure to the new venture.

36.    That whistleblower also advised the Company that Lei Wang, while remaining in the Company's employ, was a key collaborator with Hou in the scheme to misappropriate the Company's proprietary information and solicit key employees.

37. During this same general period, another key technical employee and subordinate of Lei Wang, Haoran Wang, was informed of the Company's intent to include him in an upcoming round of layoffs, and requested that he be retained; that request was granted, but conspicuously, Haoran Wang then voluntarily resigned, and later was revealed to be in the employ of Bot Auto.

38. Further investigation revealed that many key former employees of the Company have now entered the employment of Defendants, including but not limited to the Company's former Director of Corporate Strategy; Senior Technical Program Manager; Business Research and Senior Program Manager; Senior Manager for Lateral Control; Senior Vehicle Embedded Software Engineer; Senior Software Engineer; Senior Mechanical Engineer; Senior Accounting Manager; and Research Engineers for Mapping and Localization, Planning and Control, and Perception.

39. Upon information and belief, Hou, Wang, and other former TuSimple employees acting on their behalf and on behalf of Defendants, sought to misappropriate and did in fact misappropriate materials describing TuSimple's patented technologies.

40. Upon information and belief, dozens of specific highly confidential documents, containing comprehensive confidential information regarding TuSimple's autonomous driving technologies, as they existed during the period when key employees were being solicited by at least Hou and Wang, were misappropriated by an individual employee who now serves in a senior strategy and finance role with Defendants.

41. Upon information and belief, Hou's chief of staff sought access to certain of those same materials during her employment with TuSimple, though she had no valid reason to access such materials. Multiple instances of downloading of TuSimple information were identified as

employees separated from TuSimple, including downloading by members of the team working under Lei Wang that was the primary target of his and Hou's solicitation efforts.

42.     On information and belief, individuals acting in concert with Hou and Wang and on behalf of Defendants engaged in such large-scale unauthorized transfers of TuSimple proprietary materials from TuSimple servers that they tripped circuit breakers for those servers from the heat generated by the servers performing those transfers.

43.     On information and belief, Brian Moore, the Company's former CFIUS compliance officer who now serves in the same role with Defendants, sought to arrange for the purchase of critical custom TuSimple hardware after his departure from the Company.  As a regulatory compliance officer, Moore did not have a valid reason to request such hardware, other than to attempt to obtain such hardware so that it could by copied by Defendants.

44.     Upon learning of the foregoing whistleblower's description of Hou's and Lei Wang's improper activities, the Board of Directors asked the Company's outside corporate counsel to conduct a formal investigation, which would entail interviewing Hou.  Upon being notified that he would be interviewed by counsel, Hou immediately resigned from the Board in March 2023.

45.     The nature of Hou's former positions as CTO and CEO of the Company required that he have access to the Company's confidential, proprietary, and trade secret information, including but not limited to proprietary inventions, artificial intelligence learning models, and both positive and negative "know-how," which TuSimple spent many years and massive capital creating and developing.

46.     On information and belief, through the above solicitation and hiring of key employees with intimate knowledge of TuSimple's patented technologies, and through the above

11

misappropriation of materials describing TuSimple's patented technologies, Defendants engaged in the deliberate, knowing, and willful copying of TuSimple's patented technologies.

### Defendants Implement TuSimple's Patented Technologies

47.     On information and belief, after scheming to misappropriate the intimate details of TuSimple's patented technologies (along with other proprietary information), Defendants set about copying these patented technologies and implementing them, and did in fact implement them.

48.     On information and belief, in 2024, Defendants delivered to potential investors a document setting forth Defendants' value proposition.  In that solicitation document, Defendants represented that they would achieve "driver-out" operations within approximately one year after the commencement of its operations, and would achieve "full operations" of an initial commercial fleet within two to three years—rather than the seven years required by every competitor in the sector before it.  In this same pitch to potential investors, Defendants stated that they would achieve these results upon the investment of a fraction of the capital required by other competitors, and critically, stated that they could do so because, only months after its formation, Hou and his "team" already had "experience and knowledge about the exact and shortest path to commercialization" and "the latest technologies."

49.     The specific representations made by Defendants in that document regarding their capabilities and strategic intentions were also consistent with the details regarding TuSimple's technologies.  These representations made by Defendants reflected information contained within Company proprietary documents misappropriated by employees on behalf of Hou and Wang for use by Defendants, as set forth above.

50.     On  information and belief, it would not be possible for Defendants to achieve "driver-out" operations in approximately one year (as opposed to seven years or more), and full commercialization of autonomous trucking services in two to three years, absent copying of TuSimple's proprietary and patented technologies, developed as they were over the course of years and upon the investment of hundreds of millions of dollars.

51.     Upon yet further investigation, the Company learned that Bot Auto had in fact established an operational facility in the Houston area.  This was consistent with information received in the course of the aforementioned employee solicitation investigation, which indicated that Hou had informed the solicited employees that he was moving to Texas.  Upon information and belief, including but not limited to the timeline of events as embodied in the review of the aforementioned employees' uses of personal laptops and the investigation of Hou's solicitations of key TuSimple employees on behalf of Defendants, Defendants undertook much of the conduct constituting the implementation of TuSimple's proprietary and patented technologies in Harris County, where Hou resides and Defendants conduct their operations.

52.     Defendants are now openly conducting product development operations on public roads in the Houston metropolitan area using TuSimple's patented technologies, including the testing of prototype autonomous trucks that, for the reasons set forth below, infringe the patented technologies developed by TuSimple.

53.     In particular, Hou's statements could not be true, and Defendants could not be conducting their development operations with the test vehicles on Houston-area roads, were it not also utilizing TuSimple's proprietary designs of safety systems and the related patented technologies described below.  Additionally, the key former TuSimple employee in charge of the development of such systems – the former Executive Vice President for Technology Lei Wang –

was a central subject of the investigation of key employees' uses of personal computers containing TuSimple Proprietary Information, and of the aforementioned solicitation investigation. Upon the information received in the course of those investigations, Lei Wang was in fact one of the then-current employees of TuSimple who conspired with Hou to effect the wholesale transfer of these key technologies to Defendants.

54.     As set forth above, Defendants have recently stated their intention to commence "driver-out" autonomous truck testing on the public roads in the Houston area—that is, the operation of self-driving 18-wheelers on the public roads without human drivers at the wheel or operating the truck remotely—this summer. Bot Auto is hurtling toward this step (and thus trying to outrun the consequences of its wrongdoing) despite the absence of any public submission of a Voluntary Safety Self-Assessment (*i.e.*, a detailed public description of the operator's safety regime) to the National Highway Transportation Safety Administration, and despite the apparent absence of staff sufficient to develop and implement necessary safety engineering measures and a safety case for such critical testing operations. For example, on information and belief, Defendants only recently hired their first, and only, safety operations executive. The absence of such a public submission, in advance of Defendants' intended efforts to send unpiloted freight trucks down Houston-area roads, indicates that such a submission, if prepared truthfully and in the normal course and form, would further evidence Defendants' misappropriation and infringement of TuSimple's proprietary information and patented technologies.

14

## **The Accused Products – Defendants' Autonomous Trucks**

74.     Bot Auto has committed acts of patent infringement through the development and use of its autonomous trucking vehicles ("Accused Products").   The Accused Products utilize an array of cameras and other sensors to control a commercial truck without being controlled by a human driver.   An image of one of the Accused Products is shown on Bot Auto's website, https://bot.auto/:



75.     Bot Auto's autonomous trucks include many of the critical safety features developed by TuSimple, including specific redundant steering and braking system configurations, among others.

76.     Bot Auto extensively promotes the presence of these redundant safety systems. Hou has repeatedly promoted these systems stating "Bot Auto's vehicles are built with full redundancy, from steering and braking systems to sensors and computing power," (https://www.temy.co/rebuilding-trust-in-autonomous-trucking-how-bot-auto-is-driving-the-industry-forward), and "the company also is adding layers of redundancy to the communication

cabling, the power supply and the steering and braking systems so that a component failure would not lead to a system failure."  (https://bot.auto/news/bot-auto-plans-driver-out-autonomous-trucking-pilot-in-2025).

77.    Bot Auto promoted these features extensively in a news story featured by KHOU in Houston.  *See* https://www.khou.com/article/tech/driverless-big-rigs-between-houston-san-antonio-2025/285-a377d2fd-d240-43ad-969a-1736cc441c4f.  In this story, Bot Auto describes the safety systems and redundancies present in the Accused Products, including systems and redundancies that, on information and belief, are copies of TuSimple's patented technologies.

### Defendants' Knowledge of the Asserted Patents

78.    On information and belief, Defendants knew, or at the least were willfully blind to the fact that, the TuSimple technologies that they were misappropriating and copying were patented.

79.    Hou, Wang, and other involved key employees formerly employed by TuSimple, but now employed by Defendants, each signed an employee Proprietary Information and Inventions Agreement ("PIIA") with TuSimple.  The PIIA executed by Hou, for instance, includes the following language regarding his obligations with regard to assigned inventions and nonuse of Proprietary Information:

> I agree that all Assigned Inventions (and all other financial, business, legal and technical information regarding or relevant to any Company Interest that is not generally publicly known), including the identity of and any other information relating to the Company's employees, Affiliates and Business Partners (as such terms are defined below), that I develop, learn or obtain during my employment or that are received by or for the Company in confidence, constitute "Proprietary Information" [of the Company]. I will hold in strict confidence and not directly or indirectly disclose or use any Proprietary Information, except as required within the scope of my employment. My obligation of nondisclosure and nonuse of Proprietary Information under this Section shall continue until I can document that it is or becomes readily generally available to the public without restriction through no fault of mine (understanding that breach of this Agreement would be such a

fault) or, if a court requires a shorter duration, then the maximum time allowable by law will control.

Substantially similar language appears in each PIIA executed by each employee of the Company.

80.     The PIIA also includes the following language regarding the survival of the employee's obligations after termination of employment relationship:

> I agree that any change or changes in my employment title, duties, compensation, or equity interest after the signing of this Agreement shall not affect the validity or scope of this Agreement. I agree that the terms of this Agreement, and any obligations I have hereunder, shall continue in effect after termination of my employment, regardless of the reason, and whether such termination is voluntary or involuntary, and that the Company is entitled to communicate my obligations under this Agreement to any of my potential or future employers. I will provide a copy of this Agreement to any potential or future employers of mine, so that they are aware of my obligations hereunder. This Agreement, and any obligations I have hereunder, also shall be binding upon my heirs, executors, assigns and administrators, and shall inure to the benefit of the Company, its Affiliates, successors and assigns. This Agreement and any rights and obligations of the Company hereunder may be freely assigned and transferred by the Company, in whole or part, to any third party.

81.     Hou, and the other key employees of the Company that ultimately followed him to Defendants, were thus aware that all technologies and products developed while they were employed by TuSimple constituted Proprietary Information and Assigned Inventions of TuSimple.

82.     In addition, Defendants had actual knowledge, and notice, of the Asserted Patents and the applications that became the Asserted Patents prior to the filing of this Complaint for at least the reason that Xiaoling Han ("Han") is currently employed as the Head of Hardware with Bot Auto.  Upon information and belief, Han joined Bot Auto in January 2024.

83.     Prior to joining Bot Auto, from August 2019 to December 2023, Han was employed by TuSimple as the Director of Software and Sensors.   Han is a named inventor on

several patents, including the following Asserted Patents:  the '776 Patent, the '270 Patent, and the '284 Patent.   Han assigned to TuSimple all rights in the '776 Patent, the '270 Patent, and the '284 Patent.

84.     Upon information and belief, Han is and was aware of each of the applications that led to the '776 Patent, the '270 Patent, and the '284 Patent.  Further, upon information and belief, Han is and was aware of the '776 Patent, the '270 Patent, and the '284 Patent as of their respective dates of issuance: February 14, 2023 for the '776 Patent; July 30, 2024 for the '270 Patent; and January 30, 2024 for the '284 Patent.

85.     Upon information and belief, at least as early as January 2024, Defendants' knew of the '776 Patent and the '284 Patent, and their infringement thereof, through Han's employment as Bot Auto's Head of Hardware.

86.     Upon information and belief, at least as early as July 30, 2024, Defendants had notice of the '270 Patent, and Defendants' infringement thereof, through Han's employment as Bot Auto's Head of Hardware.

87.     Further, as set forth above, each of Hou and Wang regularly worked with the technologies covered by TuSimple's patents, including the Asserted Patents, and had comprehensive access to all repositories of proprietary information and patented technologies while in the employ of TuSimple.  Yet further, as set forth above, each of Hou and Wang, on behalf of Defendants, were motivated to, and in fact did, execute a scheme to effect the misappropriation of TuSimple's proprietary and patented technologies and to infringe upon such patented technologies as they deemed beneficial to their new venture.  Yet further, Defendants have solicited and employed former employees of TuSimple, identified above, whose areas of

responsibility while employed by TuSimple included the patented technologies set forth in the foregoing patents.

88.    For the foregoing reasons, and further on information and belief, prior to the filing of this litigation, Defendants knew of the Asserted Patents and their infringement thereof through the employment of Hou, Wang, Han, and other former TuSimple employees intimately involved with the technologies covered by the Asserted Patents, or were willfully blind to their infringement of the Asserted Patents which was certain to occur through their deliberate misappropriation and copying of TuSimple's patented technologies.

**Defendants' Copying and Infringement of TuSimple's Patented Technologies Has Resulted in Substantial Damages, and Presents Acute Risks If Allowed To Continue**

89.    As described above, Defendants have misappropriated the Company's proprietary information and are now infringing upon multiple patented technologies held by TuSimple.  By the public admissions and activities of Hou, Defendants' founder and CEO, and by the Defendants' public statement and activities, it is clear that Defendants are developing competing products and systems utilizing those patented technologies, and preparing imminently to take competing products and systems to market.

90.    More troublingly, for purposes of TuSimple's ongoing business and its efforts to protect and deploy its technology and know-how, Defendants have sought and received investment capital from multiple sources overseas, including sources from the People's Republic of China.  Specifically, Hou has participated in "road shows" (*i.e.*, investment solicitation efforts) in cooperation with M31 Capital, a prominent investment fund operating in Beijing and Shanghai, China.  In those efforts, Hou has traveled with personnel of M31 Capital to London, United Kingdom; Riyadh, Saudi Arabia; Doha, Qatar; and Abu Dhabi, United Arab Emirates.  In connection with the London delegation—and despite Defendants' headquarters facility and

operations in this District—M31 Capital described Hou as one of "30 top Chinese entrepreneurs," and in connection with the delegation to the Middle East, as a member of "an elite delegation of senior Chinese CEOs and executives."

91.     Certain of the investors identified in Defendants' September 27, 2024 announcement of its most recent capital raise, including Cherubic Ventures, Linear Capital, and M31 Capital, maintain their principal places of business overseas, in locales including the Cayman Islands and the People's Republic of China.

92.     The Company has expended considerable resources and effort, in cooperation with appropriate agencies of the United States Government and pursuant to a detailed National Security Agreement with the Departments of Defense and the Treasury, to ensure that its advanced technologies will remain securely within the United States.  Access to those technologies is governed by an export control Access Control List, which limits access to US employees who have passed checks, and is on a need-only basis.  Foreign employees and contacts are not allowed access.  Furthermore, on the platforms where the Company maintains its proprietary information, there are over 2,100 separate access-controlled data repositories, each with its own vetted administrator; Hou and Wang, as technical executives, had access to *all* of these repositories.

93.     Defendants' efforts to misappropriate and copy the Company's proprietary and patented technologies are animated in substantial part by Defendants' intention to circumvent these controls, and enable the deployment of those technologies overseas, and for the benefit of non-U.S. persons.  On information and belief, Hou, as CEO of Defendants, has falsely represented to at least one potential investor that the Company's recent restructuring resulted from the Company's need to comply with its arrangements with the United States Government to

ensure protection of the technologies in question, and has truthfully represented to that potential investor that Defendants will not regard themselves as being similarly constrained.

94.    For the reasons set forth above, and on information and belief, there is an acute risk that TuSimple's proprietary and patented technologies will be transferred by Defendants to unknown parties overseas, resulting in damage that will be irreparable.

95.    This risk—not only to TuSimple's interests, but to the national security interests of the United States—of Defendants' misappropriation and copying of TuSimple's proprietary and patented technologies was highlighted and corroborated in recent correspondence by a prominent U.S. Senator and member of the Committees on the Judiciary and on Homeland Security and Governmental Affairs, to Attorney General Pam Bondi, in which that Senator urged the Attorney General both to review the previous investigation described above and to take steps to ensure that Defendants, under the control of Hou, do not transfer national-security-sensitive information to China. *See* Correspondence from Sen. Josh Hawley to Attorney General Pam Bondi, May 28, 2025, *located at* https://www.hawley.senate.gov/wp-content/uploads/2025/05/Hawley-Letter-to-AG-Bondi-on-Export-Violations.pdf.

96.    In its promotion of their business to potential investors, Defendants have admitted that they are operating in direct competition with TuSimple. In fact, Defendants' statement of their market offering is a copy of the Company's longstanding value proposition. Defendants' investment proposal documents state that it "offers middle-mile autonomous Transportation-as-a-Service (TaaS), on highways and surface streets, hub to hub." Defendants' offering is the very same market offering described by the Company in its previous IPO filing, and in many other investor presentations, during Hou's tenure with the Company.

97.     For all the foregoing reasons, and upon further information and belief, Defendants Bot Auto, Inc., Bot Auto TX, Inc., and Bot Auto CA, Inc. have each engaged in active infringement of Plaintiff's patented technologies, including the Asserted Patents.

98.     In particular, upon information and belief and upon the specific allegations set forth herein, Bot Auto TX, Inc. and Bot Auto CA, Inc. are actively and presently infringing upon the Asserted Patents, and Bot Auto, Inc. stands to benefit from and has enabled active infringements by Bot Auto TX, Inc. and Bot Auto CA, Inc., by knowingly and intentionally raising and providing funds in service to such infringements, providing other assistance and instrumentalities to its affiliates in support of such infringements, and acting to conceal such infringements from the market and from TuSimple.

99.     For all the foregoing reasons, Plaintiff now faces the risk of business-critical damages, many if not most of which will not be compensable by pecuniary remedies.

## CLAIMS

## COUNT I – INFRINGEMENT OF U.S. PATENT NO. 11,577,776

100.     Plaintiff incorporates paragraphs 1 through 99 herein by reference.

101.     The '776 Patent, titled "Managing Redundant Steering System for Autonomous Vehicles," was duly and legally issued by the U.S. Patent and Trademark Office on February 14, 2023, after a full and fair examination.  The named inventors on the '776 Patent are Kaixin Zhang, Xiaoling Han, and Zehua Huang.  A true and correct copy of the '776 Patent is attached hereto as Exhibit A.

102.     Plaintiff is the assignee of the '776 Patent with ownership of all substantial rights in the '776 Patent, including the right to exclude others and to enforce, sue, and recover damages for past and future infringements.

103.    The '776 Patent is valid and enforceable.

104.    Defendants do not have a license to practice any of the inventions claimed in the '776 Patent.

105.    Defendants directly infringe at least claim 1 of the '776 Patent by making, using, selling, offering to sell, and/or importing the Accused Products which meet every limitation of at least claim 1 of the '776 Patent.

106.    The Accused Products, upon information and belief, perform a method for controlling an autonomous vehicle.

107.    The Accused Products' method for controlling an autonomous vehicle includes, upon information and belief, sending a first control command that instructs a first motor coupled to a steering wheel in a steering system to steer a vehicle.

108.    The Accused Products' method for controlling an autonomous vehicle includes, upon information and belief, receiving, after sending the first control command, a speed of the vehicle, a yaw rate of the vehicle, and a steering position of the steering wheel.

109.    The Accused Products' method for controlling an autonomous vehicle includes, upon information and belief, determining an expected range of steering angles that describes values within which the first motor is expected to steer the vehicle based on the first control command, wherein the expected range of steering angles are determined as a function of at least the speed of the vehicle and the yaw rate of the vehicle.

110.    The Accused Products' method for controlling an autonomous vehicle includes, upon information and belief, upon determining that the steering position of the steering wheel is outside the expected range of steering angles, sending a second control command that instructs a second motor coupled to the steering wheel in the steering system to steer the vehicle.

111.    As the direct and proximate result of Defendants' conduct, Plaintiff has suffered and, if Defendants' conduct is not stopped, will continue to suffer, severe competitive harm, irreparable injury, and significant damages, in an amount to be proven at trial.  Because Plaintiff's remedy at law is inadequate, Plaintiff seeks, in addition to damages, injunctive relief.

112.    Plaintiff is entitled to injunctive relief and damages of no less than a reasonable royalty in accordance with 35 U.S.C. §§ 271, 281, 283, and 284.

113.    Defendants' conduct, including their infringement of the '776 Patent, is exceptional and entitles Plaintiff to attorneys' fees and costs under 35 U.S.C. § 285.

114.    Defendants have known of the '776 Patent since at least January 2024, and their infringement has been and continues to be willful and egregious, entitling Plaintiff to enhanced damages in accordance with 35 U.S.C. § 284.

## COUNT II – INFRINGEMENT OF U.S. PATENT NO. 12,049,270

115.    Plaintiff incorporates paragraphs 1 through 114 herein by reference.

116.    The '270 Patent, titled "Managing Redundant Steering System for Autonomous Vehicles," was duly and legally issued by the U.S. Patent and Trademark Office on July 30, 2024, after a full and fair examination.  The named inventors on the '270 Patent are Kaixin Zhang, Xiaoling Han, and Zehua Huang.  A true and correct copy of the '270 Patent is attached hereto as Exhibit B.

117.    Plaintiff is the assignee of the '270 Patent with ownership of all substantial rights in the '270 Patent, including the right to exclude others and to enforce, sue, and recover damages for past and future infringements.

118.    The '270 Patent is valid and enforceable.

119.    Defendants do not have a license to practice any of the inventions claimed in the '270 Patent.

120.    Defendants directly infringe at least claim 1 of the '270 Patent by making, using, selling, offering to sell, and/or importing the Accused Products which meet every limitation of at least claim 1 of the '270 Patent.

121.    The Accused Products, upon information and belief, perform a method for controlling an autonomous vehicle.

122.    The Accused Products' method for controlling an autonomous vehicle includes, upon information and belief, sending a first command that causes a first motor in a steering system to steer a vehicle.

123.    The Accused Products' method for controlling an autonomous vehicle includes, upon information and belief, receiving a steering position of a steering wheel after the first motor is caused to steer the vehicle in accordance with the first command.

124.    The Accused Products' method for controlling an autonomous vehicle includes, upon information and belief, performing a first determination that the steering position is within a range of values, wherein the range of values is a function of at least a speed of the vehicle and a yaw rate of the vehicle.

125.    The Accused Products' method for controlling an autonomous vehicle includes, upon information and belief, sending, in response to the first determination, a second command that causes the first motor in the steering system to steer the vehicle.

126.    As the direct and proximate result of Defendants' conduct, Plaintiff has suffered and, if Defendants' conduct is not stopped, will continue to suffer, severe competitive harm,

irreparable injury, and significant damages, in an amount to be proven at trial.  Because

Plaintiff's remedy at law is inadequate, Plaintiff seeks, in addition to damages, injunctive relief.

127.    Plaintiff is entitled to injunctive relief and damages of no less than a reasonable

royalty in accordance with 35 U.S.C. §§ 271, 281, 283, and 284.

128.    Defendants' conduct, including their infringement of the '270 Patent, is

exceptional and entitles Plaintiff to attorneys' fees and costs under 35 U.S.C. § 285.

129.    Defendants have known of the'270 Patent since at least its July 30, 2024, date of

issuance and their infringement has been and continues to be willful and egregious, entitling

Plaintiff to enhanced damages in accordance with 35 U.S.C. § 284.

## COUNT III – INFRINGEMENT OF U.S. PATENT NO. 11,884,284

130.    Plaintiff incorporates paragraphs 1 through 129 herein by reference.

131.    The '284 Patent, titled "Braking Control Architectures for Autonomous Vehicles,"

was duly and legally issued by the U.S. Patent and Trademark Office on January 30, 2024, after a

full and fair examination.  The named inventors on the '284 Patent are Yu-Ju Hsu and Xiaoling

Han.  A true and correct copy of the '284 Patent is attached hereto as Exhibit C.

132.    Plaintiff is the assignee of the '284 Patent with ownership of all substantial rights

in the '284 Patent, including the right to exclude others and to enforce, sue, and recover damages

for past and future infringements.

133.    The '284 Patent is valid and enforceable.

134.    Defendants do not have a license to practice any of the inventions claimed in the

'284 Patent.

135.    Defendants directly infringe at least claim 1 of the '284 Patent by making, using, selling, offering to sell, and/or importing the Accused Products which meet every limitation of at least claim 1 of the '284 Patent.

136.    The Accused Products, upon information and belief, include a system for controlling vehicle breaking.

137.    The Accused Products' system for controlling vehicle breaking includes, upon information and belief, a braking system included in a vehicle and configured to operate brakes.

138.    The Accused Products' system for controlling vehicle breaking includes, upon information and belief, is further configured to receive a first set of commands generated by a primary brake controller and a primary vehicle control unit comprising multiple processors.

139.    The Accused Products' system for controlling vehicle breaking includes, upon information and belief, is further configured to receive a second set of commands generated by the primary vehicle control unit and a secondary brake controller.

140.    The Accused Products' system for controlling vehicle breaking includes, upon information and belief, is further configured to receive a third set of commands generated by the primary brake controller and a secondary vehicle control unit comprising multiple processors.

141.    The Accused Products' system for controlling vehicle breaking includes, upon information and belief, is further configured to receive a fourth set of commands generated by the secondary vehicle control unit and the secondary brake controller.

142.    The Accused Products' system for controlling vehicle breaking includes, upon information and belief, a processor configured to select, based on an arbitration logic, an operational set of commands as one of the first set of commands, the second set of commands,

the third set of commands, and the fourth set of commands and operate the braking system based on the operational set of commands.

143.    As the direct and proximate result of Defendants' conduct, Plaintiff has suffered and, if Defendants' conduct is not stopped, will continue to suffer, severe competitive harm, irreparable injury, and significant damages, in an amount to be proven at trial.  Because Plaintiff's remedy at law is inadequate, Plaintiff seeks, in addition to damages, injunctive relief.

144.    Plaintiff is entitled to injunctive relief and damages of no less than a reasonable royalty in accordance with 35 U.S.C. §§ 271, 281, 283, and 284.

145.    Defendants' conduct, including their infringement of the '284 Patent, is exceptional and entitles Plaintiff to attorneys' fees and costs under 35 U.S.C. § 285.

146.    Defendants have known of the '284 Patent since at least its January 30, 2024, date of issuance and their infringement has been and continues to be willful and egregious, entitling Plaintiff to enhanced damages in accordance with 35 U.S.C. § 284.

### <u>COUNT IV – INFRINGEMENT OF U.S. PATENT NO. 11,076,109</u>

147.    Plaintiff incorporates paragraphs 1 through 146 herein by reference.

148.    The '109 Patent, titled "Sensor Layout for Autonomous Vehicles," was duly and legally issued by the U.S. Patent and Trademark Office on July 27, 2021, after a full and fair examination.  The named inventor on the '109 Patent is Lei Nie.  A true and correct copy of the '109 Patent is attached hereto as Exhibit D.

149.    Plaintiff is the assignee of the '109 Patent with ownership of all substantial rights in the '109 Patent, including the right to exclude others and to enforce, sue, and recover damages for past and future infringements.

150.    The '109 Patent is valid and enforceable.

151. Defendants do not have a license to practice any of the inventions claimed in the '109 Patent.

152. Defendants directly infringe at least claim 1 of the '109 Patent by making, using, selling, offering to sell, and/or importing the Accused Products which meet every limitation of at least claim 1 of the '109 Patent.

153. The Accused Products include a vehicle capable of autonomous operation.

154. The Accused Products include, upon information and belief, a plurality of forward-facing cameras coupled to the vehicle and configured to have a field of view in front of the vehicle, at least three forward-facing cameras of the plurality of forward-facing cameras having different focal lengths.

155. The Accused Products include a right-side camera coupled to a right side of the vehicle, the right-side camera configured to have a field of view to a right of the vehicle.

156. The Accused Products include a left-side camera coupled to a left side of the vehicle, the left-side camera configured to have a field of view to a left of the vehicle.

157. The Accused Products include at least two backward-facing cameras coupled to the vehicle and configured to have a field of view behind the vehicle, the at least two backward-facing cameras having a focal length that is same as a focal length of one of the at least three forward-facing cameras.

158. As the direct and proximate result of Defendants' conduct, Plaintiff has suffered and, if Defendants' conduct is not stopped, will continue to suffer, severe competitive harm, irreparable injury, and significant damages, in an amount to be proven at trial. Because Plaintiff's remedy at law is inadequate, Plaintiff seeks, in addition to damages, injunctive relief.

159.    Plaintiff is entitled to injunctive relief and damages of no less than a reasonable royalty in accordance with 35 U.S.C. §§ 271, 281, 283, and 284.

160.    Defendants' conduct, including their infringement of the '109 Patent, is exceptional and entitles Plaintiff to attorneys' fees and costs under 35 U.S.C. § 285.

161.    Defendants have known of the '109 Patent since at least January 2024 and their infringement has been and continues to be willful and egregious, entitling Plaintiff to enhanced damages in accordance with 35 U.S.C. § 284.

## COUNT V – INFRINGEMENT OF U.S. PATENT NO. 12,231,783

162.    Plaintiff incorporates paragraphs 1 through 161 herein by reference.

163.    The '783 Patent, titled "Sensor Layout for Autonomous Vehicles," was duly and legally issued by the U.S. Patent and Trademark Office on February 18, 2025, after a full and fair examination.  The named inventor on the '783 Patent is Lei Nie.  A true and correct copy of the '783 Patent is attached hereto as Exhibit E.

164.    Plaintiff is the assignee of the '783 Patent with ownership of all substantial rights in the '783 Patent, including the right to exclude others and to enforce, sue, and recover damages for past and future infringements.

165.    The '783 Patent is valid and enforceable.

166.    Defendants do not have a license to practice any of the inventions claimed in the '783 Patent.

167.    Defendants directly infringe at least claim 1 of the '783 Patent by making, using, selling, offering to sell, and/or importing the Accused Products which meet every limitation of at least claim 1 of the '783 Patent.

168.    The Accused Products include, upon information and belief, a plurality of forward-facing cameras coupled to a vehicle and configured to have a field of view in front of the vehicle.

169.    The Accused Products include, upon information and belief, a first backward-facing camera coupled to the vehicle and configured to have a field of view behind the vehicle, the first backward-facing camera having a first focal length.

170.    The Accused Products include, upon information and belief, a second backward-facing camera coupled to the vehicle and configured to have the field of view behind the vehicle, the second backward-facing camera having a second focal length that is same as the first focal length of the first backward-facing camera.

171.    The Accused Products include, upon information and belief, the plurality of forward-facing cameras having different focal lengths from one another.

172.    The Accused Products include, upon information and belief, one of the plurality of forward-facing cameras having a focal length that is same as the first focal length of the first backward-facing camera.

173.    As the direct and proximate result of Defendants' conduct, Plaintiff has suffered and, if Defendants' conduct is not stopped, will continue to suffer, severe competitive harm, irreparable injury, and significant damages, in an amount to be proven at trial.  Because Plaintiff's remedy at law is inadequate, Plaintiff seeks, in addition to damages, injunctive relief.

174.    Plaintiff is entitled to injunctive relief and damages of no less than a reasonable royalty in accordance with 35 U.S.C. §§ 271, 281, 283, and 284.

175.    Defendants' conduct, including their infringement of the '783 Patent, is exceptional and entitles Plaintiff to attorneys' fees and costs under 35 U.S.C. § 285.

176.    Defendants have known of the '783 Patent since at least its February 18, 2025, date of issuance and their infringement has been and continues to be willful and egregious, entitling Plaintiff to enhanced damages in accordance with 35 U.S.C. § 284.

## COUNT VI – INFRINGEMENT OF U.S. PATENT NO. 12,190,609

177.    Plaintiff incorporates paragraphs 1 through 176 herein by reference.

178.    The '609 Patent, titled "Method and System for Map Construction," was duly and legally issued by the U.S. Patent and Trademark Office on January 7, 2025, after a full and fair examination.  The named inventors on the '609 Patent are Minhao Jiang, Hsin Lu, Genmao Shi, and Ziqi Liu.  A true and correct copy of the '609 Patent is attached hereto as Exhibit F.

179.    Plaintiff is the assignee of the '609 Patent with ownership of all substantial rights in the '609 Patent, including the right to exclude others and to enforce, sue, and recover damages for past and future infringements.

180.    The '609 Patent is valid and enforceable.

181.    Defendants do not have a license to practice any of the inventions claimed in the '609 Patent.

182.    Defendants directly infringe at least claim 1 of the '609 Patent by making, using, selling, offering to sell, and/or importing the Accused Products which meet every limitation of at least claim 1 of the '609 Patent.

183.    The Accused Products, upon information and belief, perform a method for map construction.

184.    The Accused Products' method for map construction includes, upon information and belief, constructing an outline circumscribing a plurality of lanes on a road based on a plurality of segments that extend along the plurality of lanes or the road.

185. The Accused Products' method for map construction includes, upon information and belief, identifying an individual outline of each of the plurality of lanes based on the plurality of segments and the outline circumscribing the plurality of lanes, wherein the plurality of segments is obtained by partitioning polylines describing a shape of the road into segments that are constructed on a start point, an end point, or a turning point of the polylines.

186. As the direct and proximate result of Defendants' conduct, Plaintiff has suffered and, if Defendants' conduct is not stopped, will continue to suffer, severe competitive harm, irreparable injury, and significant damages, in an amount to be proven at trial. Because Plaintiff's remedy at law is inadequate, Plaintiff seeks, in addition to damages, injunctive relief.

187. Plaintiff is entitled to injunctive relief and damages of no less than a reasonable royalty in accordance with 35 U.S.C. §§ 271, 281, 283, and 284.

188. Defendants' conduct, including their infringement of the '609 Patent, is exceptional and entitles Plaintiff to attorneys' fees and costs under 35 U.S.C. § 285.

189. Defendants have known of the '609 Patent since at least its January 7, 2025, date of issuance and their infringement has been and continues to be willful and egregious, entitling Plaintiff to enhanced damages in accordance with 35 U.S.C. § 284.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demand a jury trial on issues triable to a jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for entry of judgment as follows:

a) That Defendants have infringed and continue to infringe one or more claims of the Asserted Patents;

b)  That Plaintiff recover all damages to which it is entitled under 35 U.S.C. § 284, but in no event less than a reasonable royalty;

c)  That Defendants be permanently enjoined from further infringement of the Asserted Patents;

d)  That Plaintiff, as the prevailing party, shall recover from Defendants all taxable costs of court;

e)  That Plaintiff shall recover from Defendants all pre- and post-judgment interest on the damages award, calculated at the highest interest rates allowed by law;

f)  That Defendants' conduct was willful and that Plaintiff should therefore recover treble damages, including attorneys' fees, expenses, and costs incurred in this action, and an increase in the damage award pursuant to 35 U.S.C. § 284;

g)  That this case is exceptional and that Plaintiff shall therefore recover its attorneys' fees and other recoverable expenses, under 35 U.S.C. § 285; and

h)  That Plaintiff shall recover from Defendants any such other and further relief as the Court deems appropriate.

Dated: July 21, 2025                              Respectfully submitted,


                                        By:  _/s/  Brittany De Hoyos_____

                                            **Timothy J. McCarthy** (*pro hac vice*
                                            *forthcoming*)
                                            State Bar No. 24123750
                                            tmccarthy@dykema.com
                                            **Brittany De Hoyos**
                                            SDTX Fed Id #3924858
                                            State Bar No. 24132489
                                            bdehoyos@dykema.com

**DYKEMA GOSSETT PLLC**
1717 Main Street, Suite 4200
Dallas, Texas 75201
Telephone: (214) 462-6400
Facsimile: (214) 462-6401

**Michael P. Adams**
SDTX Fed Id #2406779
State Bar No. 00872050
madams@dykema.com

**DYKEMA GOSSETT PLLC**
111 Congress Avenue, Suite 1800
Austin, Texas 78701
Telephone: (512) 703-6300

**Michael J Word (*pro hac vice forthcoming*)**
Illinois Bar Number 6297998
mword@dykema.com

**DYKEMA GOSSETT PLLC**
10 S. Wacker Dr.
Suite 2300
Chicago, IL 60606
Telephone: (213) 876-1700

**ATTORNEYS FOR PLAINTIFF
TUSIMPLE, INC.**

126057.000001 4930-7315-6434.16